```
                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF RHODE ISLAND
_____
                                    )
                                    )
JOHN C. PONTE,                      )
                                    )
            Plaintiff,              )
                                    )
      v.                            )     C.A. No. 14-115 S
                                    )
SAGE BANK, formerly known as        )
Lowell Cooperative Bank,            )
                                    )
            Defendant.              )
_____)
```

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Chief Judge.

Defendant, Sage Bank ("Sage"), has moved for sanctions, up to and including dismissal of the action, for Plaintiff's unauthorized review of Sage's confidential and privileged information relating to Sage's litigation strategy in this case ("the privileged information").[1]  (ECF No. 34.)  Plaintiff, John C. Ponte, opposes Sage's motion.  (ECF Nos. 36-37.)  Following a three-day evidentiary hearing (ECF Nos. 49, 57-58), the parties filed post-hearing memoranda.  (ECF Nos. 55-56.)  After considering the evidence adduced at the hearing and the parties'

---

[1] Although Plaintiff challenges Sage's assertion that the privileged information is privileged, this Court has conducted an in camera review of the documents submitted by Sage and concludes that the vast majority of the emails and several of the documents are privileged.  Additionally, there is no persuasive evidence that Sage waived its privilege with respect to the privileged information.

pre- and post-hearing memoranda, this Court GRANTS Sage's motion and DISMISSES Ponte's complaint WITH PREJUDICE.

I. Background

Ponte filed suit against Sage, his former employer, asserting numerous claims arising from Sage's alleged breach of an agreement that governed the employment relationship between Sage and Ponte. (ECF No. 1-1.) Sage removed the case to this Court (ECF No. 1), and, at first, this case appeared to be on the ordinary track. However, the case was soon derailed; on May 30, 2014, Ponte's counsel, Christopher M. Mulhearn, Esq., sent counsel for Sage an email in which Mulhearn ominously warned: "[I]f I were you, I would be very careful what you ask for. Please see attached." (Mulhearn Email, ECF No. 18.)[2] The attached document referenced by Mulhearn was a privileged email from Sage's counsel to Sage executives setting forth counsel's assessment of assertions previously made by Mulhearn about the strength of Ponte's case.[3] (See ECF No. 18.)

---

[2] ECF No. 18 was filed as a sealed document. However, after reviewing the document, this Court determines that the Mulhearn email should not be sealed. Accordingly, the Mulhearn email is no longer sealed, but the remainder of ECF No. 18 will remain sealed.

[3] The three Sage executives to whom this privileged email was sent all provided declarations in which each stated that he or she did not share the privileged email (or any of the information contained therein) with Ponte or anyone else. (See Decl. of Richard E. Bolton, Jr. ¶¶ 4-5, ECF No. 15-1; Decl. of

After receiving Mulhearn's email, Sage's counsel pressed Mulhearn for details on how he came into possession of one of Sage's privileged emails.  (See Decl. of Russell Berger ("Berger Decl.") ¶¶ 5, 7, ECF No. 15-1; Ex. 2 to Berger Decl., ECF No. 15-1; Ex. 4 to Berger Decl., ECF No. 15-1.)  Deeming Mulhearn's explanation insufficient, Sage filed a motion for temporary restraining order and preliminary injunction.  (ECF No. 15.)  After an in-chambers conference (ECF No. 33), this Court granted Sage's motion and enjoined Ponte and his agents from reviewing, using, or disclosing any communications between Sage and its counsel; the Court also ordered that Ponte return the information to Sage and destroy all electronic and hard copies of the information in his possession.  (ECF No. 25.)  After a period of limited discovery relating to how Ponte came into possession of the privileged information, Sage filed the instant motion for sanctions.  (ECF No. 34.)

Although not much clarity emerged from the three-day evidentiary hearing, the following facts are clear to the Court.  The privileged information, along with other Sage information, was placed on ShareFile, "a secure off-site repository for the retention or exchange of files," by James E. Barry, Jr., Sage's

---

Denise Bey ¶¶ 4-5, ECF No. 15-1; Decl. of J. Mark Olsen ¶¶ 4-5, ECF NO. 15-1.)

3

then-Vice President of Information Technology and Security.[4] (April 1, 2015 Evidentiary Hr'g Tr. ("Day 2 Hr'g Tr.") 31:19-23, ECF No. 57; see id. at 30:9-10, 30:16-18, 55:19-56:7, 57:12-14; April 7, 2015 Evidentiary Hr'g Tr. ("Day 3 Hr'g Tr.") 7:17-8:8, 26:24-27:5, ECF No. 58.) Barry uploaded the privileged information, which consisted of Sage emails that he had obtained from Sage's email archive, in electronic format, either as personal storage ("PST") files or offline storage ("OST") files. (See Day 2 Hr'g Tr. 55:19-56:7, ECF No. 57; Day 3 Hr'g Tr. 28:22-29:14, ECF No. 58.) Without any request from Ponte, Barry granted Ponte or Richard R. Ponte – who is Ponte's cousin and Barry's friend – access to the folder(s) in which Sage information, including the privileged information, was stored.[5] (See Day 2 Hr'g Tr. 34:5-35:1, ECF No. 57; Day 3 Hr'g Tr. 33:16-18, ECF No. 58; see also March 17, 2015 Evidentiary Hr'g Tr.

---

[4] Around the time that Sage discovered that Ponte possessed the privileged information, Barry left Sage's employ for reasons unrelated to the privileged information. (See March 17, 2015 Evidentiary Hr'g Tr. ("Day 1 Hr'g Tr.") 15:18-16:7, 17:13-18:5, ECF No. 49; April 7, 2015 Evidentiary Hr'g Tr. ("Day 3 Hr'g Tr.") 60:13-61:4, ECF No. 58.)

[5] Barry testified that he intended to allow the Pontes to access only certain information and not the privileged information but that, through a mistake on his part, the Pontes were permitted to access the privileged information. (See Day 2 Hr'g Tr. 36:14-16, 44:2-22, 45:5-13, 54:18-23, ECF No. 57; Day 3 Hr'g Tr. 33:24-34:15, 89:1-8, 89:15-17, ECF No. 58.) Compounding this access error, Barry believes that he was not sufficiently clear when directing Richard to the correct Sage information on ShareFile. (See Day 3 Hr'g Tr. 34:16-23, 89:8-10, ECF No. 58.)

("Day 1 Hr'g Tr.") 106:17, 108:5-6.) Richard[6] accessed ShareFile from his desktop, opened the files containing the privileged information, printed them, and gave the hard copies to Ponte. (See Day 1 Hr'g Tr. 113:1-6, 117:20-118:10, 119:5-7, 119:24-120:22, 127:16-128:4, 131:23-24, 132:12-13, ECF No. 49.)

A few days after Ponte received the privileged information from Richard, he informed Mulhearn about it. (See id. at 151:17-24, 152:22-25.) Ponte testified that, up to this point, he had not reviewed the privileged information, apart from a quick glance to ascertain what Richard had provided him. (See id. at 152:25-153:1, 153:5-11, 163:9-17.) Ponte testified that, although Mulhearn advised him not to do anything with respect to the privileged information, he disregarded this advice and read the privileged information.[7] (See id. at 165:5-22, 170:2-6; see also Day 2 Hr'g Tr. 17:22-25, ECF No. 57.) Additionally, soon after Ponte informed Mulhearn about the privileged information, Mulhearn sent the email to Sage's counsel that attached a

---

[6] To distinguish between Plaintiff and his cousin, the Court refers to Plaintiff as "Ponte," his cousin as "Richard," and both Plaintiff and his cousin as "the Pontes."

[7] During follow-up questioning from the Court, Ponte attempted to distance himself from his prior testimony; his later testimony is that he read the privileged information before speaking with Mulhearn about it. (See Day 2 Hr'g Tr. 22:10-16, 22:25-23:5, 25:13-21, 26:1-27:4, ECF No. 57.) The Court finds that Ponte's later testimony in this regard is not credible; his earlier testimony makes clear that he deliberately reviewed the privileged information after Mulhearn told him not to do so.

5

privileged email from Sage's counsel to Sage executives. (See Day 1 Hr'g Tr. 163:3-8, ECF No. 49; Mulhearn Email, ECF No. 18.)

A focal point of the evidentiary hearing was the uncertainty surrounding the circumstances of, and the motivation behind, Barry's actions.[8] Barry testified that an internal power struggle was afoot at Sage during the time when he uploaded the privileged information to ShareFile. (See Day 3 Hr'g Tr. 73:21-74:10, ECF No. 58.) According to Barry, his immediate supervisor at Sage – Jeffrey Guimond, Sage's Senior Vice President of Bank Operations (see Day 1 Hr'g Tr. 67:9, 67:20-21, 68:12-13, ECF No. 49) – was involved in that power struggle. (See Day 3 Hr'g Tr. 5:24-6:1, 73:21-74:10, ECF No. 58.) Barry testified that Guimond, in an effort to discredit a Sage executive on the opposite side of the struggle, directed Barry to "fact-check" certain information or "compare notes" with Ponte. (See Day 2 Hr'g Tr. 42:8-25, ECF No. 57; Day 3 Hr'g Tr. 18:5-19:1, 55:19-25, 58:11-59:9, ECF No. 58.) Barry further testified that Guimond directed Barry to search Sage's email archive system for emails relating to Ponte and his litigation against Sage Bank as part of this "fact-checking" effort. (See Day 3 Hr'g Tr. 12:23-13:6, ECF No. 58.) Barry downloaded the emails relating to "fact-checking" purposes to his desktop and

---

[8] There is no persuasive evidence that either of the Pontes sought out the privileged information from Barry. (See Day 3 Hr'g Tr. 31:18-21, 39:8-12, 46:14-25, ECF No. 58.)

6

uploaded them to ShareFile.  (See id. at 80:11-81:1.)  For his part, Guimond emphatically denied ever instructing Barry to provide Sage information, including the privileged information, to the Pontes.  (See Day 1 Hr'g Tr. 75:2-6, 80:7-12, 99:10-12, ECF No. 49.)

Ultimately, the question of whether Barry was instructed by Guimond to provide the Pontes with certain information for "fact-checking" purposes or did so of his own volition need not be resolved in order to decide Sage's motion for sanctions. Barry testified that the privileged information, which Barry obtained by searching Sage's email archive system for permutations of the name of Sage's lead counsel, had nothing to do with the information that Barry uploaded to ShareFile for purposes of the "fact-checking" endeavor; Barry testified that the "fact-checking" information should not have contained any privileged emails because of the different search parameters that Barry used to obtain that information.  (See Day 3 Hr'g Tr. 81:2-16, 82:17-83:23, 84:7-18, 85:9-23, 87:17-88:25, ECF No. 58.)  Additionally, it was solely Barry's decision to upload the privileged information to ShareFile because it may have related to a potential whistleblower claim that Barry was contemplating. (See id. at 92:24-93:14.)   And, as explained above, see supra note 5, Barry intended for the Pontes to be able to access only the information that he uploaded to ShareFile for "fact-

7

checking" purposes, and not the privileged information; but an error on Barry's part allowed for Richard to access both the "fact-checking" information and the privileged information. (See Day 2 Hr'g Tr. 36:14-16, 44:2-22, 45:5-13, 54:18-23, ECF No. 57; Day 3 Hr'g Tr. 33:24-34:23, 85:4-8, 89:1-10, 89:15-17, ECF No. 58.) Indeed, even if Barry is correct that Guimond directed him to share certain information with the Pontes for "fact-checking" purposes, he acknowledged that no one from Sage told him to disclose the privileged information to Ponte, and, to the extent that occurred, it was an accident. (See Day 3 Hr'g Tr. 50:17-23, ECF No. 58.)

In any event, regardless of the uncertainty surrounding the circumstances of, and motivations behind, Barry's actions, Ponte's conduct after receiving the emails is determinative. Ponte testified that he has vast experience dealing with attorneys. (See Day 1 Hr'g Tr. 138:22-139:3, ECF No. 49.) Ponte understood the attorney-client privilege, and appreciated the advantages that can flow to a litigant who comes into possession of an opponent's attorney-client communications. (See id. at 139:4-10.) Moreover, Ponte acknowledged that he understood the privileged character of the privileged information in this case. (See id. at 139:11-15, 141:5-18.) Ponte also knew that privileged documents generally cannot be obtained by the adverse party through discovery. (See id. at

8

150:1-6.) And yet, notwithstanding this extensive knowledge, Ponte decided to read and use the privileged information. (See id. at 141:20-21, 168:8-169:11.) Even more problematic, Ponte read the privileged emails in defiance of the advice of his counsel. (See id. at 165:5-22, 170:2-6; see also Day 2 Hr'g Tr. 17:22-25, ECF No. 57.) Mulhearn's initial conduct after being informed of the privileged information was equally brazen. Rather than informing opposing counsel that his client had found himself in possession of Sage's attorney-client communications, Mulhearn sent an email to Sage's counsel attaching one of the privileged emails and threatening, "[I]f I were you, I would be very careful what you ask for."[9] (Mulhearn Email, ECF No. 18.)

Moreover, to make matters worse for Ponte, he subsequently engaged in efforts to cover his tracks. It appears as though some crude effort was made to redact the top of the headings of

---

[9] Additionally, someone in Ponte's camp – Ponte, Richard, or Mulhearn – made handwritten notations on hard copies of the privileged information, some of which comment on strategies discussed in the emails pertaining to Sage's litigation with Ponte. (See PRIV 000010, 12, 20, 364, 369, 371, 375, 377-78, Def.'s Ex. G.) Although both Ponte and Mulhearn denied writing on the privileged information (see Day 1 Hr'g Tr. 168:1-6, 171:6-8, 172:2-7, ECF No. 49; Pl.'s Opp'n to Mot. for Sanctions ("Pl.'s Opp'n") 18, ECF No. 37), Barry explained that the privileged emails, which were uploaded to ShareFile as PST or OST electronic files, could not have contained handwriting on them at the time they were uploaded and that the handwriting must have occurred at some point after the privileged information was printed. (See Day 2 Hr'g Tr. 56:8-57:8, ECF No. 57.) Thus, although no one admitted to writing on the privileged information, either Ponte or one of his agents clearly did so.

9

the privileged emails. On the top of the heading of one of the emails, the name of Richard's company, LendTech, appears. (See PRIV 000347, Def.'s Ex. G; see also Day 1 Hr'g Tr. 106:24-107:10, ECF No. 49; Day 2 Hr'g Tr. 12:15-20, ECF No. 57.) On several other emails, the portion of the heading that contained LendTech appears to have been redacted, perhaps by whiteout or some other method (see PRIV 000002, 7, 14, 16, 22, 28, 35, 38, 40, 44, 68, 94, 137, 139, 283, 306, 314, 322, 330, 357, 361, 373, 379, Def.'s Ex. G; see also Day 2 Hr'g Tr. 13:3-12, 13:22-14:1, ECF No. 57); indeed, in two of these emails, portions of the "L" in LendTech appear to be visible (see PRIV 000361, 379, Def.'s Ex. G). Additionally, although Ponte and Barry exchanged emails discussing Sage after Ponte received the privileged information and although Sage sought those emails in advance of Ponte's deposition (see Day 1 Hr'g Tr. 177:21-178:8, 180:25-181:3, 183:11-13, ECF No. 49; Day 2 Hr'g Tr. 71:23-72:8, 73:24-74:3, ECF No. 57; Def.'s Ex. D), the emails were never produced because Ponte deleted them. (See Day 1 Hr'g Tr. 181:4-182:4, 183:14-24, 184:20-23, ECF No. 49.)

Further, Ponte has not fully complied with this Court's order for the return of the privileged information. This Court ordered Ponte, "and any and all agents of Ponte," to return all of the information that Ponte received from Barry after Ponte left Sage. (Order 1, ECF No. 25.) However, Ponte admitted that

10

he did not return all of the information to Sage, and that some of it remained in Richard's possession.[10] (See Day 1 Hr'g Tr. 185:3-21, 190:2-6, ECF No. 49.)

Ponte's review of the privileged information has prejudiced Sage. Ponte testified that he learned new information through his review of the privileged information, and he planned on amending his complaint to make use of this information. (See Day 1 Hr'g Tr. 145:25-146:10, 147:3-9, 150:7-10, ECF No. 49.) Additionally, emboldened by this newfound intel, Ponte dramatically increased his settlement demand. (See Berger Decl. ¶ 11, ECF No. 15-1; Ex. 4 to Berger Decl., ECF No. 15-1.) In an email Ponte sent to two Sage executives after Sage learned of his possession of the privileged information, he attempted to leverage his knowledge of the privileged information in order to obtain a settlement with Sage. He referred to the privileged information as "terribly damaging documentation that provides me additional proof that not only shore up and substantiate my claims against you, but offer additional insight into what can only be described as nefarious activity and may very well create potentially damaging issues with your regulators, as well as

---

[10] Similarly, because the privileged information that Ponte returned to Sage was clearly a photocopy of the original documents to which the handwritten notations were made and the whiteout applied, it is not clear whether Ponte is still in possession of the privileged information. He was instructed by this Court to destroy all copies in his possession after returning the information to Sage. (See Order 2, ECF No. 25.)

11

opening you to potentially devastating civil actions." (Ponte's June 16, 2014 Email, ECF No. 19-1.) As part of his settlement proposal, Ponte "agree[d] to not divulge to anyone the information in my possession that I believe will harm you." (Id.) He closed his email by warning Sage, "You do not want me as an enemy. [I] have read that in countless email correspondence between you." (Id.)

Finally, the Court finds that Ponte testified untruthfully at the evidentiary hearing. He routinely gave evasive answers to questions from both Sage's counsel and this Court. He testified that the truth can change over time. (See Day 1 Hr'g Tr. 143:20-24, ECF No. 49.) His testimony was riddled with inconsistencies concerning a host of subjects. (Compare Day 1 Hr'g Tr. 141:24-142:1, 142:5-142:9, ECF No. 49, with id. at 168:22; compare id. at 145:25-146:10, 147:3-9, 150:7-10, with id. at 160:6-12; compare id. at 139:7-10, with id. at 155:12-15; compare id. at 153:2-4, with id. at 160:18-22; compare Day 2 Hr'g Tr. 6:10-12, ECF No. 57, with id. at 6:13-21; compare id. at 17:22-25, with id. at 22:10-16, 22:25-23:5, 25:13-21, 26:1-27:4.) During the short time that Ponte was on the stand, he changed his tune on such important questions as how much and what types of the privileged information he reviewed (compare Day 1 Hr'g Tr. 141:24-142:1, 142:5-9, ECF No. 49 (Ponte's testimony that he only read the information that did not pertain

12

to his case against Sage), with id. at 168:22 ("I only read what I thought was pertaining to me"), and Day 2 Hr'g Tr. 21:9-22:5, ECF No. 57; cf. Decl. of John C. Ponte ¶ 37, ECF No. 20-2 (stating that Barry did not provide Ponte with information having nothing to do with Ponte's case against Sage)), and whether he reviewed the privileged information before or after he spoke with Mulhearn about receiving it (compare Day 1 Hr'g Tr. 152:25-153:1, 153:5-11, 163:9-17, ECF No. 49, and Day 2 Hr'g Tr. 17:22-25, ECF No. 57, with id. at 22:10-16, 22:25-23:5, 25:13-21, 26:1-27:4).[11]

Ponte's refusal to truthfully answer the questions he was asked has made it impossible for this Court to determine with any confidence the actual extent to which Ponte reviewed the privileged information and has complied with this Court's order regarding return of the privilege information to Sage. Moreover, having heard Ponte testify, this Court has no confidence that, moving forward, Ponte will abide by the discovery rules and this Court's future orders. The only convincing aspect of Ponte's testimony was the message, whether conveyed intentionally or not, that Ponte does not regard his

---

[11] Interestingly, when pressed during questioning, Ponte, Richard, and Barry each claimed that a recent medical condition affected his ability to recall pertinent events, and each seemed very eager to have the record reflect that circumstance. (See Day 1 Hr'g Tr. 109:16-21, 133:4-7, ECF No. 49; Day 2 Hr'g Tr. 8:2-7, 37:1-3, 37:10-14, 72:11-20, ECF No. 57.)

review of Sage's privileged information as important enough to warrant the inquiry that Sage has undertaken.

II. Discussion

Sage seeks sanctions under this Court's inherent powers. It is well settled that federal courts possess the inherent power "to fashion an appropriate sanction for conduct which abuses the judicial process." Chambers v. NASCO, Inc., 501 U.S. 32, 44-45 (1991). The sanction of outright dismissal of a lawsuit is within the arsenal of the Court's inherent-power sanctions. See id.; R.W. Int'l Corp. v. Welch Foods, Inc., 937 F.2d 11, 20 (1st Cir. 1991). To be sure, the sanction of dismissal is strong medicine that should not be administered too liberally. See Young v. Gordon, 330 F.3d 76, 81 (1st Cir. 2003); Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 28 (1st Cir. 1998). However, in cases of extreme misconduct, it remains an appropriate sanction. See Young, 330 F.3d at 81.

After full consideration of the evidence presented, this Court deems this case to be the rare one involving the requisite level of misconduct to warrant dismissal as a sanction. Although the circumstances surrounding Richard's access of the privileged information are murky, Ponte's misconduct after receiving the information is clear and damning. Ponte understood the attorney-client privilege, its importance, and the privileged nature of the emails he received. He was also

14

instructed by Mulhearn not to read the emails. Notwithstanding all of these caution flags, Ponte went ahead and read the privileged information to procure an advantage. His conduct was in deliberate disregard of his attorney's admonition, and his willful invasion of Sage's privileged information was flagrantly improper and constitutes extreme misconduct.

Moreover, Ponte's transgressions did not end with his unjustified review of Sage's privileged information. Instead, Mulhearn sent an email to Sage's counsel containing a thinly veiled threat and attaching a privileged email. (See Mulhearn Email, ECF No. 18.) Following the example set by his attorney, Ponte pushed the envelope a bit further. After gleaning all favorable information from the privileged information (and bookmarking certain emails with handwritten notations), Ponte sent his own email to Sage that expressly used the newly acquired information to leverage a settlement with Sage. (See Ponte's June 16, 2014 Email, ECF No. 19-1.) This Court will not countenance such strong-arm tactics, especially where, as here, the bargaining strength stems from an unauthorized and plainly improper review of an adversary's privileged communications.

Additionally, Ponte's conduct, both before and during the evidentiary hearing, has frustrated the Court's search for truth and undermined its ability to effectively police the conduct of those that come before it. Even after Sage learned of Ponte's

15

possession of the privileged information, Ponte deleted emails between him and Barry that discussed Sage. Before returning the privileged information to Sage, someone in Ponte's camp crudely redacted "LendTech" from the headings of all but one of the emails – no doubt in an effort to conceal Richard's involvement in this bizarre saga. Worse still, Ponte's evasive and untruthful testimony, which alone warrants sanctions, has prevented the Court from ascertaining precisely what happened once Ponte received the privileged information. See Jackson v. Microsoft Corp., 211 F.R.D. 423, 431-33 (W.D. Wash. 2002) (dismissing plaintiff's action where plaintiff claimed not to have known from whom he obtained CDs containing privileged communications and confidential information and told an "elaborate series of lies about his misconduct"). Finally, Ponte's admission that, in violation of this Court's order, he did not return all of the information to Sage and that some of it remains in Richard's possession is further proof that an order of the Court cannot ensure that Ponte will litigate his case against Sage honestly and within the rules. Cf. Young, 330 F.3d at 81 ("[D]isobedience of court orders is inimical to the orderly administration of justice and, in and of itself, can constitute extreme misconduct.").

III. Conclusion

For these reasons, this Court finds that the undeniably severe sanction of dismissal of Ponte's action is the only appropriate sanction for Ponte's extreme misconduct.[12] Accordingly, it is hereby ordered that Ponte's complaint be DISMISSED WITH PREJUDICE and further ordered that Ponte is hereby ENJOINED from using the privileged information for any purpose.

IT IS SO ORDERED.

_[signature: Wesmith]_

William E. Smith
Chief Judge
Date:  September 22, 2015

---

[12] In addition to dismissal, Sage also seeks an award of attorneys' fees. (See Sage's Post-hearing Br. 18-19, ECF No. 55.)  The Court declines to tack on attorneys' fees to its sanction of dismissal.  The sanction imposed will preclude Ponte from obtaining his day in court on the claims asserted in his complaint.  Although the Court deems this action appropriate in this case, the severity of this sanction cannot be gainsaid.  Imposing an award of attorneys' fees on top of the severe sanction of dismissal strikes this Court as too draconian for the facts of this case.